**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CASE NO. 5:15-CV-00063-RLV-DCK**

| | |
|---|---|
| DANA L. CULBREATH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER IS BEFORE THE COURT** on cross-motions for summary judgment. (Docs. 9, 11). Plaintiff has also filed a brief in response to Defendant's Motion for Summary Judgment. (Doc. 15). For the reasons that follow, the Plaintiff's Motion for Summary Judgment (Doc. 9) is **DENIED**, the Defendant's Motion for Summary Judgment (Doc. 11) is **GRANTED**, and the decision of the Commissioner is hereby **AFFIRMED**.

**I.     PROCEDURAL & ADMINISTRATIVE HISTORY**

In March 2009, Plaintiff Dana L. Culbreath, filed an application for disability insurance benefits and for supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, 1396, *et seq.*, alleging an inability to work due to a disabling condition commencing on July 20, 1999. (Tr. at 135-38, 1124-25; *see also* Tr. 79-80). Plaintiff's application identified major depression, post traumatic stress syndrome, carpal tunnel syndrome, tendonitis, hyperthyroidism, anxiety, and insulin resistance as disabilities that prevented her from working. (*See* Tr. 82). Relevant to the Title II application, Plaintiff's last date of insurance for disability benefits was March 31, 2005. (Tr. 82, 1122).

On May 18, 2009, the Commissioner of Social Security ("Commissioner" or "Defendant") approved Plaintiff's request for supplemental security income under Title XVI, finding that she suffered from "affective/mood disorders" and "anxiety related disorders" as of March 6, 2009. (Tr. 79, 1121). The Commissioner, however, denied Plaintiff's request for disability insurance benefits under Title II, finding that her alleged conditions were "not severe enough prior to the end of [her] insured period to be considered disabling." (Tr. 80, 82-85, 1121). Plaintiff's request for reconsideration of the denial of disability insurance benefits was denied. (Tr. 81, 87-89, 1122). Plaintiff filed a request for a hearing and testified before Administrative Law Judge Emanuel C. Edwards ("ALJ Edwards") on October 6, 2010. (Tr. 35-58, 90-91). Plaintiff's husband, Damon Culbreath, also testified at the October 6, 2010 hearing before ALJ Edwards. (Tr. 58-75).

On October 28, 2010, ALJ Edwards issued a decision denying Plaintiff's claim. (Tr. 13-21, 1122). In so deciding, ALJ Edwards identified affective disorder and carpal tunnel syndrome as severe impairments but concluded that Plaintiff "had the residual functional capacity to perform a wide range of unskilled medium work" with some functional limitations based on her physical and mental impairments. (Tr. 16-17). Finding further that the functional limitations "had little or no effect on the occupational base of unskilled medium work" for purposes of Step 5 of his analysis, ALJ Edwards, without calling a vocational expert, consulted the Medical Vocational Guidelines and concluded that Plaintiff was "not disabled." (Tr. 20-21). The Appeals Council denied Plaintiff's request for review of ALJ Edwards's decision. (Tr. 1-3).

On July 5, 2011, Plaintiff filed a complaint in this Court seeking judicial review of ALJ Edwards's unfavorable decision. *See Culbreath v. Colvin*, 2014 WL 2882803, at *2 (W.D.N.C. Feb. 25, 2014). More than two years after filing her complaint, Plaintiff moved for summary judgment. *See id*. Magistrate Judge David Keesler issued a memorandum and recommendation

concluding that ALJ Edwards erred by limiting the range of unskilled medium work Plaintiff could perform while simultaneously finding Plaintiff "not disabled" based exclusively on his own review of the Medical Vocational Guidelines. *Id.* at 3-6. This Court adopted the memorandum and recommendation, vacated ALJ Edwards's decision, and remanded the case "for rehearing or any other administrative proceedings that may be appropriate." *Culbreath v. Colvin*, 2014 WL 2882808, at *4 (W.D.N.C. June 25, 2014).

On remand, Administrative Law Judge Robert Egan ("ALJ Egan") conducted a hearing, at which Plaintiff, Plaintiff's counsel, and Vocational Expert Karl S. Weldon ("VE Weldon") appeared. (Tr. 1144-1210). At the hearing, Plaintiff amended the alleged onset date of her disability to March 1, 2005. (Tr. 1190-91). After asking Plaintiff a few questions, ALJ Egan indicated that he interpreted this Court's remand order as constraining him to adopt ALJ Edwards's residual functional capacity assessment and to only take testimony from a vocational expert for purposes of reevaluating Step 5 of ALJ Edwards's decision. (Tr. 1160-71). Plaintiff's counsel, however, persuaded ALJ Egan that this Court's order vacating ALJ Edwards's decision nullified the decision as a whole and that ALJ Egan could evaluate Plaintiff's claim anew. (Tr. 1172-90). As over nine and a half years elapsed between the alleged onset date of Plaintiff's disability and the hearing before ALJ Egan, ALJ Egan, with Plaintiff's assent, decided to rely on the testimony from Plaintiff's first hearing rather than take new testimony from Plaintiff. (Tr. 1183). ALJ Egan proceeded by asking VE Weldon several hypotheticals and permitting Plaintiff's counsel to present arguments about the merits of Plaintiff's claim, including that Damon Culbreath's testimony at Plaintiff's hearing before ALJ Edwards supported Plaintiff's claim that she experienced paranoid thoughts as part of a delusional disorder dating back to at least March 2005. (Tr. 1193-1209).

On February 25, 2015, ALJ Egan issued a decision concluding that, for purposes of Title II disability insurance benefits, Plaintiff was not disabled from March 1, 2005 through March 31, 2005. (Tr. 1121-33). At Step 1 of his analysis ALJ Egan noted that Plaintiff engaged in part-time work from December 2004 to February 2005 and again from 2013 through the date of the hearing. (Tr. 1124). Although ALJ Egan concluded that Plaintiff's earnings were insufficient to qualify her part-time work as substantial gainful activity, he noted that her work in 2004 to 2005 served as evidence of her daily activities and capacity immediately before the alleged disability onset date. *Id.* Before proceeding to Step 2, ALJ Egan evaluated Plaintiff's medical records, noted that he "carefully reviewed" the audio recording of Plaintiff's hearing before ALJ Edwards, and concluded that Plaintiff's testimony about the extent of her depression and about experiencing paranoid thoughts and delusions in March 2005 was less than credible. (Tr. 1124-28). In making his credibility determination, ALJ Egan relied on (1) the lack of treatment notes supporting Plaintiff's claim of post-partum depression; (2) Plaintiff's failure to seek mental health treatment prior to 2005 despite originally alleging that her symptoms commenced in 1999; (3) Plaintiff's failure to apprise her psychiatrist, Dr. James Barker, of the full extent of her alleged symptoms when she sought his treatment in July 2006; (4) Dr. Barker not diagnosing Plaintiff as suffering from a delusional disorder during the first two years that he treated her; and (5) Plaintiff's ability, in the periods of time preceding and surrounding her claim of disability, to perform part time work, raise three young children, and return to school in pursuit of certification in phlebotomy. (Tr. 1124-28; *see also* 1130-31). Nonetheless, for purposes of Step 2, ALJ Egan concluded that Plaintiff, as of March 31, 2005, suffered from severe medically determinable impairments of carpal tunnel syndrome in her right wrist and depression. (Tr. 1124-28). At Step 3 of the analysis, ALJ

Egan concluded that Plaintiff's severe impairments did not rise to the level of any of the listed impairments. (Tr. 1128-29).

ALJ Egan then established Plaintiff's residual functional capacity, finding that she could perform light work with a physical restriction for "frequent but not constant or continuous handling and fingering of objects" and that she had the "mental and cognitive ability for simple, routine, unskilled tasks in a work environment that was not highly stressful and which required only occasional contact with supervisors, coworkers and the public." (Tr. 1129-31). In so concluding, ALJ Egan again discounted Plaintiff's contention that she suffered from major debilitating depression and paranoid thoughts as part of a delusional disorder in March 2005. *Id.* Specifically, ALJ Egan found that there was no medical basis for her claim, that had she experienced the alleged conditions and symptoms she would have filed for disability benefits before 2009, and that her assertions amounted to little more than "an attempt . . . to show entitlement to benefits prior to her date last insured." *Id*. ALJ Egan also noted that the record did not contain any statement from a treating or examining physician opining that Plaintiff could not work in March 2005 and that, contrary to Plaintiff's claim of major debilitating depression, treatment notes show that her depression was "improving" and "stable." (Tr. 1131). Applying the residual functional capacity at Step 4, ALJ Egan, nonetheless, concluded that Plaintiff was unable to perform any of her past relevant work. *Id*. For purposes of Step 5, ALJ Egan relied on VE Weldon's identification of the jobs of housekeeper and of inspector as work Plaintiff could perform given her residual functional capacity and the aforementioned physical and mental/cognitive restrictions. (Tr. 1131-32). Accounting for the availability of those jobs circa March 2005, ALJ Egan determined that Plaintiff was not disabled. (Tr. 1132).

Without seeking review by the Appeals Council, Plaintiff filed her present complaint

challenging ALJ Egan's determination that she was not disabled as of March 31, 2005. (Doc. 1); *see also* 20 C.F.R. § 404.984(d). Through a motion for summary judgment and supporting memorandum of law, Plaintiff seeks the reversal of ALJ Egan's decision and a remand for a third hearing.[1] (Docs. 9-10). Plaintiff argues that (1) the ALJ erred by not evaluating Damon Culbreath's testimony about her mental symptoms before concluding that her testimony was not credible; and (2) remand is required for consideration of new and material evidence. (Doc. 9 at 1-2; Doc. 10 at 2-3, 11-19).

**II.   STANDARD OF REVIEW**

The Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the Commissioner applied the correct legal standards. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; [i]t consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir.1996) (internal quotation marks and citation omitted) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). "In reviewing for substantial evidence, [a court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id.*

---

[1] Plaintiff's Memorandum of Law is not in compliance with this Court's "Social Security Briefing Order" (3:13-mc-198-FDW, Doc. 1). Because the deficiencies in the Plaintiff's Memorandum of Law do not inhibit the Court from evaluating the merits of Plaintiff's arguments, the Court will overlook the deficiencies. The Court, however, notes that a party's failure to conform to the requirements of this Court's Social Security Briefing Order is sufficient to warrant the dismissal of a motion for summary judgment, albeit without prejudice.

## III.   ANALYSIS

*1.   Credibility Determination*

In her first argument for remand, Plaintiff contends that ALJ Egan committed reversible error by failing to evaluate Damon Culbreath's testimony when concluding that her testimony regarding experiencing major debilitating depression and paranoid thoughts as part of a delusional disorder in March 2005 was not credible. (Doc. 10 at 11-15). Plaintiff relies on Social Security Ruling (SSR) 96-7p, 1996 WL 374186 (July 2, 1996)[2] in support of her argument. (Doc. 10 at 11-15). Defendant contends that SSR 96-7p did not require ALJ Egan to consider or evaluate Damon Culbreath's testimony but that, in any event, ALJ Egan did consider the testimony. (Doc. 12 at 8-10).

The law provides a two-part test for evaluating the probative weight to be assigned to a claimant's statements about symptoms. *Chater*, 76 F.3d at 589. First, there must be "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 594 (internal quotation marks and emphasis omitted). If the ALJ answers the first inquiry in the affirmative, the second part of the test requires him to consider all available evidence to determine whether the symptoms associated with the claimant's condition are of sufficient intensity, persistence, and limiting effect to render the claimant disabled. SSR 96-7p, at *2. The ALJ may conclude that the claimant's symptoms limit the claimant's activities to a greater or lesser degree than the claimant asserts. *Id.* at *4.

---

[2] Subsequent to Plaintiff filing her motion for summary judgment, the Social Security Administration superseded SSR 96-7p with SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). Social Security Ruling 16-3p eliminates the use of the term "'credibility' from . . . sub-regulatory policy" and "clarify[ies] that subjective symptom evaluation is not an examination of an individual's character." *Id.* at *1. Because SSR 96-7p was in effect at the time of ALJ Egan's decision, this Court will review the decision under SSR 96-7p. *See Keefer v. Colvin*, 2016 WL 5539516, at *11 n.5 (D.S.C. Sept. 30, 2016).

In assessing the intensity, persistence, and limiting effect of a claimant's symptoms, the ALJ looks first to the objective medical evidence. *See id.* at *2. Where the objective medical evidence does not substantiate the claimant's assertions about the intensity, persistence, and limiting effect of her symptoms, the ALJ must base his credibility determination on the evidence in the entire case record. *Id.* at *2, *4, *5. The entire case record is composed of "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* at *2, *see also id.* at *5. Specific to information by non-medical sources, SSR 96-7p states:

> Other sources may provide information from which inferences and conclusions *may* be drawn about the credibility of the individual's statements. Such sources may provide information about the seven factors listed in the regulations and *may* be especially helpful in establishing a longitudinal record. Examples of such sources include public and private agencies, other practitioners, and nonmedical sources such as family and friends.

SSR 96-7p, at *8 (emphasis added). Similarly, 20 C.F.R. § 404.1513 discusses the consideration due to non-medical evidence from spouses, and states that the Social Security Administration "*may* also use evidence from other sources to show the severity of [claimant's] impairment(s) and how it affects [claimant's] ability to work." 20 C.F.R. § 404.1513(d) (emphasis added).

It is clear that SSR 96-7p requires an ALJ to "consider" the testimony of other source witnesses, such as Damon Culbreath, when determining the claimant's credibility and whether the claimant is disabled. *Nowling v. Colvin*, 813 F.3d 1110, 1121 (8th Cir. 2016). Whether SSR 96-7p and 20 C.F.R. § 404.1513(d) require an ALJ to go a step further and evaluate and discuss other source witness/lay witness testimony within their written decisions is a matter of disagreement among courts. In part due to the permissive nature of 20 C.F.R. § 404.1513(d), some courts have

concluded that an ALJ need not discuss the testimony of a lay witness or explain the weight given to that witness's testimony, especially when the witness's testimony is substantially similar to the claimant's testimony and is discredited by the very evidence the ALJ relied on to discredit the claimant's testimony. *See Gray v. Colvin*, 2014 WL 4660792, at *8 (W.D. Va. Sept. 7, 2014) (noting Fourth Circuit case law holding "that it is unnecessary to discuss the testimony of lay witnesses where it is inconsistent with other evidence in the record" (citing *Laws*, 368 F.2d at 644); *Orcutt v. Barnhart*, 106 Soc. Sec. Rep. Serv. 367, 2005 WL 2387702, at *8-9 (C.D. Cal. Sept. 27, 2005) (collecting cases and stating that "[t]he view that an ALJ need not discuss every piece of evidence, even when that evidence is from a lay witness, has found support in the Seventh and Eighth Circuits, especially when lay witness testimony does little more than corroborate a plaintiff's own testimony"); *see also Igo v. Colvin*, ___ F.3d. __, 2016 WL 5939427, at *4 (8th Cir. Oct. 13, 2016) ("The ALJ is not required to explain the weight given to opinions from 'other sources' unless they include 'acceptable medical sources' or 'non-medical sources' who have seen the claimant in their professional capacity." (internal quotation marks omitted)). Other courts, however, have concluded that an ALJ commits error by not explicitly weighing non-medical source testimony or by failing to provide an explanation for why the ALJ discounted said testimony. *Burnett v. Comm'r of Soc. Sec. Admin*, 220 F.3d 112, 122 (3d Cir. 2000); *see also Myers v. Astrue*, 2012 WL 4050182, at *15-17 (E.D. Va. July 6, 2012) (remanding for new credibility determination where ALJ considered lay witness testimony but did not explain why he did not credit lay witness testimony and crediting lay witness testimony may have resulted in different outcome). Notably though, courts of the latter position almost unanimously acknowledge that an ALJ's failure to discuss and evaluate lay witness testimony constitutes harmless error if the testimony does note present a new line of evidence, does not shed light on the claimant's ability

to work, or is discredited by the same evidence that the ALJ relied on when making an adverse finding with respect to the claimant's credibility. *See Plowden v. Colvin*, 2014 WL 37217, at *4 (D.S.C. Jan. 6, 2014) (harmless error where lay witness testimony did not shed light on claimant's ability to work); *Pratt v. Astrue*, 2009 WL 4057154, at *10 n.2 (D.S.C. Nov. 19, 2009) (adopting magistrate R&R finding harmless error where lay witness testimony discredited by same evidence that discredited claimant's testimony (citing *Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995))); *see also Blackwell v. Colvin*, 2014 WL 7339132, at *6-8 (W.D.N.C. Dec. 23, 2014); *but see Burnett*, 220 F.3d at 122 (holding that error warranted remand where unevaluated testimony merely corroborated claimant's testimony but doing so as part of remand on other issues).

Evaluating SSR 96-7p in conjunction with 20 C.F.R. § 404.1512(d), this Court concludes that an ALJ must "consider" testimony from lay witnesses but does not need to evaluate or discuss the testimony if the testimony does not add a new line of evidence for analysis and is discredited by the very evidence relied on by the ALJ to discredit the claimant's testimony. Social Security Ruling 96-7p uses the word "consider" when describing the ALJ's responsibility as to other source evidence, whereas the Ruling requires the ALJ both to "consider" other forms of evidence, such as the findings of State agency consultants, and to "explain" the weight given to these other forms of evidence. *See* SSR 96-7p at *8. This less stringent requirement on the analysis an ALJ must perform with respect to other source testimony comports with the possibility that other source testimony may be of low or no probative value. It also dovetails with SSR 96-7p's permissive language that "inferences and conclusions *may* be drawn about [the claimant's statements]" and that the testimony "*may* be especially helpful in establishing a longitudinal record." SSR 96-7p at *8 (emphasis added).

A similar distinction between an ALJs responsibilities regarding medical versus non-

medical evidence is found in 20 C.F.R. § 404.1513. As to medical evidence, the regulation states that an ALJ "will consider residual functional capacity assessments made by State agency medical and psychological consultants, and other program physicians and psychologists to be 'statements about what you can still do' made by nonexamining physicians and psychologists based on their review of the evidence in the case record." 20 C.F.R. § 404.1513(c). However, specific to other evidence, including testimony from spouses, the regulation uses permissive language, stating that "[i]n addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we *may* also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work." 20 C.F.R. § 404.1513(d) (emphasis added). A requirement that an ALJ must examine and discuss the testimony of a spouse would remove the distinctions in both SSR 96-7p and 20 C.F.R. § 404.1513 and would erode the Ruling's and the Regulation's choice to direct ALJs to give greater attention to medical source evidence.

Applying this Court's conclusion about an ALJ's analytical responsibility with respect to lay witness testimony to ALJ Egan's analysis of Damon Culbreath's testimony, this Court concludes that ALJ Egan did not commit error. Damon Culbreath's testimony was largely duplicative of both Plaintiff's testimony and of information in the medical records relied on by ALJ Egan. To the later point, Damon Culbreath indicated that in March 2005, he "did not know much" about what was going on with Plaintiff and that most of his testimony was based on what he learned from conversations with Dr. Barker many years after March 2005. (Tr. 60, 73). Furthermore, Damon Culbreath expressed confusion during his testimony regarding the specific timeframe of Plaintiff's more impactful mental conditions. (*See* Tr. 60 ("I'm not sure she had [mental health treatment in 2005] or not. I got the years confused. It's been a long time."), 64 (indicating that "years are crossed" and "unsure" of what year an event occurred in)). This

temporal uncertainty diminished the independent probative value of Damon Culbreath's testimony given the very limited overlap between Plaintiff's alleged onset date of her disability and her last day of insurance coverage. Damon Culbreath's testimony also shed little light on Plaintiff's inability to work, acknowledging that Plaintiff completed courses for Phlebotomy and providing some support for ALJ Egan's conclusion that Plaintiff was able to interact with others in and around the time of her alleged disability date. (*See* Tr. 64-65 (discussing enrollment and completion of Phlebotomy classes); 68-69 (noting that it was hard to get Plaintiff to go to social events but once at an event she would "relax a little")).

Based on this Court's review of Damon Culbreath's testimony, SSR 96-7p and 20 C.F.R. § 404.1513 only required ALJ Egan to consider the testimony. Although it would have been preferable for ALJ Egan to explicitly state that he considered Damon Culbreath's testimony, ALJ Egan's statements and actions permit this Court to conclude that he did consider the testimony. First, during the hearing, ALJ Egan stated that he would listen to the audio recording of Plaintiff's hearing before ALJ Edwards and schedule an additional hearing to take further testimony if necessary. (Tr. 1182-85) Second, ALJ Egan permitted Plaintiff's counsel to present oral arguments about Damon Culbreath's testimony. (Tr. 1206-07). Third, ALJ Egan stated in his decision that he "carefully reviewed the audio recording" of Plaintiff's hearing before ALJ Edwards. (Tr. 1127). Fourth, ALJ Egan's cognizance of Damon Culbreath's relationship to Plaintiff is apparent from his reliance on Damon Culbreath's 2005 statements to Plaintiff's treating doctor that Plaintiff's mood improved with treatment. (Tr. 1126). Fifth, ALJ Egan adequately discussed Dr. Barker's findings, the primary basis for Damon Culbreath's knowledge of Plaintiff's symptoms and for his testimony. (Tr. 1127-28, 1131). Accordingly, the record reflects that ALJ Egan satisfied his duty with respect to considering Damon Culbreath's testimony.

Nonetheless, as a disagreement exists regarding whether an ALJ must evaluate and discuss the testimony of a lay witness, the Court will, in the alternative, assume that such a heightened requirement exists and conduct a harmless error analysis. Based on the aforementioned summary of Damon Culbreath's testimony, it is apparent that if ALJ Egan erred by failing to evaluate and discuss the testimony, the error was harmless. ALJ Egan's assessment of Plaintiff's daily activities and his review of Plaintiff's medical records, or the lack of medical records, to discount Plaintiff's testimony also discounts Damon Culbreath's testimony. (Tr. 1127-31). To that point, Damon Culbreath's testimony that Plaintiff was not reporting her symptoms to her doctors is duplicative of Plaintiff's own claim about not reporting symptoms. Damon Culbreath's testimony on Plaintiff's failure to report symptoms is also equally susceptible to ALJ Egan's conclusion that a reputable psychiatrist, over the course of treating a patient for two years, would have recognized that the patient was suffering from paranoid thoughts as part of a delusional disorder even in the absence of the patient reporting all of her symptoms. (*See* Tr. 1128). Finally, Damon Culbreath's testimony does little to overcome ALJ Egan's conclusion that if Plaintiff was actually suffering from debilitating depression and paranoid thoughts as part of a delusional disorder in March 2005, she would have sought more extensive mental health treatment before July 2006. *Id.*; *see also* 20 C.F.R. § 416.929(c). Therefore, because Damon Culbreath's testimony did not add a new line of evidence and because his testimony is contradicted by the same evidence ALJ Egan relied on to discredit Plaintiff's testimony, any error by ALJ Egan with respect to evaluating and discussing Damon Culbreath's testimony was harmless and does not necessitate remand.

2.  *New Evidence*

Plaintiff contends that she has new evidence, a "treating physician questionnaire," that mandates remand under sentence six of 42 U.S.C. § 405(g) because the new evidence undermines

ALJ Egan's basis for discrediting her testimony about experiencing major debilitating depression and paranoid thoughts as part of a delusional disorder in March 2005. (Doc. 10 at 15-19). The "treating physician questionnaire" consists of a two page summary, composed by Plaintiff's counsel, of Dr. Barker's notes followed by five questions, drafted by Plaintiff's counsel, that Dr. Barker answered in a total of twenty-one words. (Doc. 10-1). Dr. Barker completed the "treating physician questionnaire" on June 8, 2015, after Plaintiff filed her complaint in this action. *See id*. A considerable portion of the questionnaire focuses on Plaintiff's mental state in 2006 through 2009. *See id*. However, viewing the "treating physician questionnaire" in the light most favorable to Plaintiff, Dr. Barker opines that (1) Damon Culbreath testified truthfully regarding Plaintiff not reporting all of her symptoms until March 2009; (2) Plaintiff was "most likely" suffering from a delusional disorder prior to March 31, 2005; and (3) Plaintiff's 2009 revelation that she had not previously reported all her symptoms would not cause him to alter his 2006 through 2008 treatment note assessments that Plaintiff's mental impairment symptoms were significantly improved or stable. *Id*.

Sentence six of 42 U.S.C. § 405(g) states, in pertinent part:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that [1] there is new evidence [2] which is material *and* [3] that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding

(emphasis added). Evidence is "new" where "it is not duplicate or cumulative." *See Wilkins v. Sec., Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Id.* As to "good cause," the burden falls on the proponent of the evidence to establish good cause for not producing the evidence on the administrative level and the bar for establishing good cause is high. *Jones v. Colvin*, 2014 WL 359672, at *10 (W.D. Va. Feb. 3, 2014) (citing *Wooding v. Comm'r of*

*Soc. Sec.*, 2010 WL 4261268, at *4 (W.D. Va. Oct. 29, 2010), *Hammond v. Apfel*, 5 F. App'x 101, 103 (4th Cir. 2001)).

This Court finds that remand is not appropriate because Plaintiff fails to demonstrate good cause for not producing the "treating physician questionnaire" when before ALJ Egan. In so finding, the Court notes that the "treating physician questionnaire" was not organically produced by Dr. Barker in the course of treating Plaintiff and was not the product of any tests or treatments subsequent to Plaintiff's hearing before ALJ Egan. Although the "treating physician questionnaire" may be new in a technical sense of the word because the document was not in physical existence prior to ALJ Egan's decision, nothing constrained Plaintiff from, prior to her hearing before ALJ Egan, obtaining an affidavit from Dr. Barker regarding his retrospective opinions about Plaintiff's symptoms.[3] Other courts presented with new evidence in the form of medical opinions produced through evaluation forms have similarly concluded that the opinion's proponent, even when pro se on the administrative level, failed to satisfy the good cause standard because nothing prevented the proponent from producing the opinion while the case was in the administrative proceeding stage. *See Wooding*, 2010 WL 4261268, at *3-4 (collecting First, Fourth, and Seventh Circuit cases finding no good cause in similar situations and noting the pro se status of claimants/proponents in several cases). Accordingly, Plaintiff's failure to demonstrate good cause defeats her argument for remand under sentence six of 42 U.S.C. § 405(g).[4]

## IV. DECRETAL

---

[3] The Court notes that Dr. Barker's opinions are based on information he possessed five years prior to Plaintiff's hearing before ALJ Egan. (*See* Doc. 10-1 at 3).

[4] In so concluding, the Court notes that Plaintiff argues that she "did not know until reading the ALJ's decision that he did not believe that Dr. Barker was genuinely unaware of the true severity of her paranoid and delusional symptoms in March 2005." (Doc. 10 at 17). Not only does this argument fail because it is an after-the-fact attempt to contradict ALJ Egan's findings, *see Wooding*, 2010 WL 4261268, at *6, but it also stretches the bounds of credibility because a central issue before ALJ Egan was whether Plaintiff experienced the alleged symptoms in March 2005 and Plaintiff's decision to call Damon Culbreath as a witness at her first hearing demonstrates that she fully understood the temporal issue surrounding her claim.

**IT IS, THEREFORE, ORDERED THAT**

(1) The Plaintiff's Motion for Summary Judgment (Doc. 9) is **DENIED**;

(2) The Defendant's Motion for Summary Judgment (Doc. 11) is **GRANTED**; and

(3) The final decision of the Commissioner is hereby **AFFIRMED**.

Signed: November 15, 2016

Richard L. Voorhees
United States District Judge